NOT DESIGNATED FOR PUBLICATION

No. 116,970

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

VIRGIL DILLARD,
*Appellant*.

MEMORANDUM OPINION

Appeal from Lyon District Court; JEFFRY J. LARSON, judge. Opinion filed October 27, 2017. Affirmed in part and remanded with directions.

*James Bordonaro*, of Emporia, for appellant.

*Laura L. Miser*, assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., MCANANY, J., and HEBERT, S.J.

PER CURIAM: Virgil Dillard appeals from his conviction for possession of methamphetamine. In addition, Dillard appeals from the district court's calculation of his jail-time credit. Based on our review of the record on appeal, we conclude that the State presented sufficient evidence upon which a jury could find Dillard to have been guilty of possession of methamphetamine beyond a reasonable doubt. However, because it is unclear from the record whether the district court properly calculated Dillard's jail-time credit at sentencing and the issue may be moot, we vacate the district court's calculation of jail time and remand this issue to the district court.

1

During the afternoon of September 4, 2015, Lyon County Sheriff's Deputies Heath Samuels, Catherine Ohlemeier, and another officer drove to a house to serve an arrest warrant on Dillard. The arrest warrant had been issued for Dillard's violations of the postrelease supervision terms from another case. When the deputies arrived at the house, Charles Kluth answered the door. Deputy Samuels then talked with Rose Widener, who lived in the house with Kluth and who consented to look around the house to locate Dillard. Eventually, the deputies located Dillard in a closet.

Deputy Ohlemeier arrested Dillard on the warrant and removed him from the house. Deputy Samuels subsequently found three baggies containing a crystal-like substance in a hole in the closet where Dillard had been hiding. The deputy then received permission from Widener to continue searching the house. During the search, the deputies also found two used syringes and a baggie containing trace amounts of residue and are not material to the charges filed against Dillard.

The deputy then made contact with several other people in the house. The deputies searched each of them and advised them of their *Miranda* rights. Each of them provided written statements to the deputies denying ownership of the suspected methamphetamine found in the house.

On September 15, 2015, the State charged Dillard with two counts: distribution of methamphetamine in a volume greater than 3.5 grams and less than 100 grams, and no drug tax stamp. The State later dropped the no drug tax stamp charge. Moreover, the State amended the charge of distribution of methamphetamine to possession of methamphetamine.

On March 21, 2016, the district court commenced a two-day jury trial. The State presented the testimony of five witnesses and admitted into evidence photographs of the house, the closet where the deputies found Dillard, and the hole in the closet where the deputies found the baggies. Deputy Samuels testified that he obtained consent from Widener to search the house. As he looked for Dillard, he noted a few other people in various rooms of the house. Deputy Samuels testified that he and Deputy Ohlemeier found Dillard in a closet in a room filled with furniture. Deputy Ohlemeier took Dillard into custody and escorted him out of the room.

According to Deputy Samuels, he then found multiple baggies containing a crystal-like substance in a small hole in the closet. Deputy Samuels testified that he suspected the substance to be methamphetamine. At trial, he used photographs taken at the scene to show the proximity between where he located Dillard and where he found the baggies. Deputy Samuels testified that he collected the evidence and sent it to the Kansas Bureau of Investigation (KBI) lab for testing. The KBI later identified the crystal-like substances in the baggies as methamphetamine. Deputy Samuels further testified that he then conducted a consensual search of the house. Although he found drug paraphernalia and an additional baggie with a crystal-like substance in another part of the house, Deputy Samuels did not send this evidence to the KBI lab because it was not material to this case.

On cross-examination, Deputy Samuels testified that he did not hear any scurrying when he initially knocked on the door. He further stated that the closet Dillard hid in was relatively free of clutter, despite the rest of the room being nearly full with stacked furniture. Additionally, Deputy Samuels admitted that it was possible that someone could have reached into the closet hole from the basement through a small crack in the floor. Deputy Samuels also testified that the other people in the house all denied ownership of the baggies found in the closet.

3

Widener testified that she did not remember all of the people at her house on the day Dillard was arrested. However, she indicated that no one left the house once the deputies arrived. Widener also testified that she saw Dillard at the house prior to the arrival of the deputies and that once they arrived, everyone "scattered" around the house. Widener admitted that she is a drug addict but denied ever using the small hole in the closet in which Dillard was hiding to store drugs. She further testified that Dillard, while he was at her house on the day of the arrest, retrieved a spoon and gave it to her so she could get high. Finally, she opined—without explanation—that Deputy Samuels may have "planted" the drugs in the closet hole.

Deputy Ohlemeier corroborated Deputy Samuels' testimony. In particular, she testified about the nature of the room filled with furniture and the location of Dillard in the closet. Deputy Ohlemeier further testified that she was the one who took Dillard outside of the house and transferred him into the custody of another officer, and then returned to the house to assist Deputy Samuels take statements from the houseguests. She further testified that everyone in the house denied ownership of the methamphetamine and that Deputy Samuels did not force the group to write statements.

After the conclusion of the State's case, Dillard offered the testimony of Patty Rangel. She testified that she was with Dillard on the day that he was arrested and that she did not see him possess any drugs. She further corroborated portions of the story about police arriving, searching the houseguests, and requesting written statements from the houseguests. On cross-examination, Rangel admitted that she told the deputies in her written statement that the drugs, found in the closet, probably belonged to Dillard. Nevertheless, Rangel maintained that she knew that Dillard did not have drugs on him on September 4, 2015.

Finally, Dillard testified on his own behalf. He testified that he hid in the closet because he did not want to go to jail. However, Dillard denied possessing the

4

methamphetamine found in the hole in the closet. On cross-examination, Dillard confirmed that he gave Widener a spoon and that he knew there were drugs present in the house.

After deliberation, the jury found Dillard to be guilty of possession of methamphetamine. Although the district court released him on bond, Dillard was returned to jail after violating his conditions for release. At the sentencing hearing, the district court denied Dillard's motion for a downward dispositional or durational departure. The district court then sentenced Dillard to 20 months of prison time, with 12 months of postrelease supervision. The district court credited Dillard with 162 days for the time he was held in jail prior to and after his conviction.

ANALYSIS

On appeal, Dillard raises two issues. First, whether the evidence presented at trial was sufficient to support his conviction of possession of methamphetamine. Second, whether the district court improperly calculated the jail-time credit he should receive in this case. In response, the State contends that the evidence presented at trial was sufficient to support Dillard's conviction. In addition, the State contends that the district court did not err in calculating Dillard's conviction and, even if it had done so, the issue is now moot.

*Sufficiency of the Evidence*

"'When the sufficiency of evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" *State v. Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016). "'In making a sufficiency determination, the appellate court does not reweigh evidence, resolve

5

evidentiary conflicts, or make determinations regarding witness credibility. [Citations omitted.]'" *State v. Dunn*, 304 Kan. 773, 822, 375 P.3d 332 (2016). It is only in rare cases where the testimony is so incredible that no reasonable factfinder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

To establish a defendant's constructive possession of drugs, the State must prove more than a "mere presence or access to the drugs." *State v. Cruz*, 15 Kan. App. 2d 476, 489, 809 P.2d 1233 (1991). "[O]ther incriminating circumstances linking the defendant to the drugs" must be proved. *State v. Anthony*, 242 Kan. 493, 502, 749 P.2d 37 (1988); *State v. Beaver*, 41 Kan. App. 2d 124, 129, 200 P.3d 490 (2009). These "other incriminating circumstances" include factors such as:

> "(1) a defendant's previous participation in the sale of a controlled substance; (2) his or her use of controlled substances; (3) his or her proximity to the area where the drugs are found; (4) the fact that the drugs are found in plain view; (5) incriminating statements of the defendant; (6) suspicious behavior by the defendant; and (7) proximity of defendant's possessions to the drugs. *State v. Marion*, 29 Kan. App. 2d 287, 290, 27 P.3d 924, *rev. denied* 272 Kan. 1422 (2001); see PIK Crim. 3d 67.13-D." *State v. Dean*, 42 Kan. App. 2d 32, 39, 208 P.3d 343 (2009).

When viewed in the light most favorable to the State, we find sufficient evidence in the record to establish Dillard's constructive possession of the drugs. At trial, Dillard admitted that he was in the closet where the drugs were located. As indicated above, "proximity to the area where the drugs are found" is one of the factors that a jury may consider in determining possession. Dillard further admitted that, prior to getting into the closet, he was aware there were drugs in the house.

Moreover, Widener testified that Dillard had gave her a spoon the day of his arrest so she could get high. Widener also admitted that her home was a known drug house.

6

Likewise, Deputy Samuels testified that the house was a known drug house that he had visited before looking for criminal informants.

We also find the testimony that Dillard would have had to climb over a large amount of furniture to get into the closet in which he hid to be significant. Furthermore, while Dillard suggested that someone else could have placed the drugs into the hole in the closet from the basement, Deputy Samuels testified that to do so would have required someone to trudge through 6 inches of sewage covering the basement floor.

In summary, Dillard knew there were drugs in the house, he had participated in helping another person get high in the house that day, he hid in a location that was difficult to get to, and police found him in close proximity to drugs. When this evidence is viewed in the light most favorable to the State, we conclude that a reasonable jury could have found beyond a reasonable doubt that Dillard was guilty of possession of methamphetamine. Accordingly, we affirm Dillard's conviction.

*Jail-Time Credit*

Dillard also contends that the district court improperly calculated his jail-time credit at sentencing. Specifically, he argues that the district court improperly apportioned jail-time credit for time he was on postrelease supervision in another case. The State responds by noting that the Kansas Department of Corrections has already released Dillard from prison and that he is currently on postrelease supervision. Although we have no reason to disbelieve the State's representation, and we note that Dillard's earliest potential release date was April 1, 2017, we find nothing in the record to confirm the fact that he has been released and is now under postrelease supervision.

A review of the Judicial Branch computer system reveals that the State filed a Motion for Additions to the Record. In the motion, the State requested that the clerk of

the appellate courts add a document from the Kansas Adult Supervised Population Electronic Repository (KASPER) to the record on appeal. The document indicates that the Kansas Department of Corrections released Virgil Dean Dillard from custody on April 17, 2017. Evidently, the appellate clerk's office rejected the filing of the motion because it "should be made at the district court level." The clerk's office cited the State to Kansas Supreme Court Rule 3.02(d) (2017 Kan. S. Ct. R. 19), which addresses making additions to the record when it is not yet in the possession of this court. Unfortunately, the KASPER document was not in the record subsequently submitted by the district court, and we cannot tell whether the State attempted to add it at the district court level.

We recognize that K.S.A. 2016 Supp. 21-6615(a) establishes a right to jail-time credit. Its provisions are mandatory, but they only entitle a defendant to jail-time credit for the time he or she was held in custody solely on the charge for which the defendant is being sentenced. *State v. Harper*, 275 Kan. 888, 890, 69 P.3d 1105 (2003). In other words, if a defendant is entitled to jail-time credit in one case, he or she is not entitled to credit for the same jail time in any other case. See *State v. Prebble*, 37 Kan. App. 2d 327, 333, 152 P.3d 1245 (2007). Furthermore, a defendant cannot receive jail-time credit against postrelease supervision for time spent incarcerated on a new charge that results in a conviction and sentence. See *White v. Bruce*, 23 Kan. App. 2d 449, 453-55, 932 P.2d 448 (1997).

Under the circumstances presented, we believe the appropriate remedy is to remand the issue of jail-time credit to the district court. Assuming that the State can indeed establish that Dillard has completed his term of imprisonment and is on postrelease supervision, it may well be that this issue is moot. See *State v. Gaudina*, 284 Kan. 354, 358-60, 160 P.3d 854 (2007). Even if it is not, the district court can resolve any factual disputes while we are prohibited from doing so. Accordingly, we remand the issue of mootness to the district court. If the issue is not moot, we also direct the court to make

8

any factual determinations necessary to resolve the issue of whether Dillard's jail-time credit was appropriately calculated.

Affirmed in part and remanded with directions.